**Dr. Edwin G. HYDE, Plaintiff-Appellant,**

**v.**

**JEFFERSON PARISH HOSPITAL DISTRICT NO. 2 and East Jefferson Hospital Board, Defendants-Appellees.**

**No. 81-3091.**

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1982.

Phillip A. Wittmann, John M. Landis, New Orleans, La., for plaintiff-appellant.

Rickard F. Pfizenmayer, Washington, D. C., for amicus curiae American Soc. of Anesthesiologists, Inc.

Henry B. Alsobrook, Jr., Oscar L. Shoenfelt, III, Richard B. Eason, II, New Orleans, La., for amicus Louisiana State Medical Soc.

Lucas J. Giordano, Metairie, La., for defendants-appellees.

Ricardo M. Guevara, Baton Rouge, La., for amicus curiae Louisiana Hosp. Ass'n.

Before GARZA, POLITZ, and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

Doctor Edwin Hyde brought this action to challenge his exclusion from the medical staff of East Jefferson General Hospital in Metairie, Louisiana. He sought a declaratory judgment that the actions of the Hospital District and its Board of Directors violated Section 1 of the Sherman Act, 15 U.S.C. § 1; the Due Process clause of the Fourteenth Amendment; Sections 51:122 and 123 of the Louisiana antitrust law; and Section 46:1058 of the state enabling legislation under which the Hospital District was created. Hyde also prayed for the issuance of an injunction ordering defendants to appoint him to the hospital's medical staff. Following a trial on the merits, the court below dismissed the suit. In this appeal, plaintiff concentrates his attack on the Sherman Act portion of the district court judgment. Today, we reverse the court's judgment, for reasons stated herein. 513 F.Supp. 532.

Doctor Hyde is a board certified anesthesiologist who practices in Jefferson Parish, Louisiana. In July, 1977, he submitted an application for admission to the East Jefferson Hospital medical staff. New staff members are ultimately selected by the East Jefferson Hospital Board. According to the language of La.R.S. 46:1058 concerning the selection of new medical staff, "[s]uch appointments shall be made upon the recommendations of the physicians who are authorized to practice within the hospital." Appellant's application was therefore initially sent to the medical staff, which functions as a separate entity from the hospital. First, the Credentials Committee reviewed Hyde's medical qualifications and submitted a favorable recommendation to the Medical Staff Executive Committee. That committee then reviewed the application and recommended to the Hospital Board that appellant's application be approved. In spite of favorable recommendations from both medical staff committees, the Board voted to deny staff privileges to Dr. Hyde.

This action was occasioned by the fact that the hospital had an exclusive contract with Roux and Associates, a professional medical corporation, to provide anesthesia services.[1] Under the terms of this contract, the anesthesiologist determines the fee for the services he provides based upon the complexity and length of the operation performed. Patients are billed jointly for the anesthesia services provided by the doctor

1. The first contract between the parties was executed in February, 1971, and explicitly granted to Roux the exclusive right to provide anesthesia services. This exclusive language was deleted when the parties entered into a second contract in January, 1976. However, the executive director of the hospital testified that another provision, retained in the 1976 contract, had the same effect as the provision deleted. Regardless of the existence of any exclusive contract between the parties at present, the hospital continues to maintain the type of closed group policy at issue here. There is no question, hence, but that this is indeed a live controversy.

and by the hospital. The hospital deducts eight percent for bad debts, charity and other write-offs from the gross receipts of the department and then remits fifty percent of the remaining sum to Roux and Associates.

The provision of anesthesia services in each of East Jefferson Hospital's thirteen operating rooms is, in large part, undertaken by nurse anesthetists. At least one hospital-employed nurse anesthetist is assigned to each room. The four anesthesiologists employed by Roux and Associates travel between the rooms as they are needed for supervision. Anesthesia is routinely administered by the nurse anesthetist. An anesthesiologist remains with a patient only for more complicated operations. Appellees aver that the system employed is in the best interest of quality patient care. The monitoring of specialized equipment and supervision of nurses can best be handled, in their estimation, by the closed group policy. This closed group policy also gives the hospital the continuous twenty-four hour a day coverage that is crucial in the event of an emergency.[2] Other arguments made to justify the policy are that it facilitates the use of operating rooms since no waiting for outside anesthesiologists is necessary and that it wisely allows the responsibility for development and management of the department to be placed upon one individual with legal obligations to the hospital. Finally, the appellees assert that the closed group policy permits them to more closely monitor the professional standards employed by the department members.

After a trial on the merits, the district court ordered this suit dismissed. In the corresponding opinion, the court rejected a *per se* in favor of a rule of reason analysis of this case, stating in the alternative that plaintiff could not prevail on a *per se* analysis because he had not made the necessary demonstration that the hospital "dominated" the market for its services. The court held that relief was unavailable under a rule of reason analysis because the anticompetitive effects of the closed group policy were few and far outweighed by the many benefits to patient care. On appeal, Hyde argues that: (1) the tying arrangement involved is not immune from *per se* liability solely because of the professional nature of the services involved; (2) the district court erred in holding that the defendant hospital must be shown to have dominant power in the tying product market; and 3) the court

2. This point of justification is rebutted quite easily, however, since Dr. Kermit Roux, president of Roux and Associates, admitted that he would feel professionally bound to provide such coverage even in the absence of an exclusive contract. It was Dr. Roux, after all, who requested that the exclusive language in the contract be removed. At trial, Dr. Roux explained the reason for his request:

Q The Judge asked you if in fact when the 1976 contract was negotiated and executed, you asked that the language calling for the exclusion of the other anesthesiologists be deleted from the contract.

A Yes, sir.

Q So that it would no longer be a part of the contract?

A Yes, sir. The reason we did that, there were a number of reasons. There was this other group that had requested to come practice there and led us to believe that some physicians preferred them to give their anesthetics. And if that were true, then I think they should be allowed to practice.

The other reason is pretty much what you have alluded to, I didn't want to be there on the basis of hiding behind a contract. If I couldn't provide the service as best I could, then someone else ought to have a shot at it.

And I had been told by people a number of times that, you're hiding behind the contract because it gives you exclusive privileges "exclusive privileges" and doesn't let anyone else come. And I don't believe that that's the way medicine should be practiced. It should be practiced on the basis of the person whom the physician or the patient feels can do the best job, should be their physician.

So, we finally got them to delete that part of the contract.

Record on Appeal, vol. 3, at 7–8.

After this language was deleted, he continued to provide twenty-four hour a day coverage. Although the hospital's executive director testified that another provision, retained in the 1976 contract, had the same effect as the provision deleted, Dr. Roux did not operate under this interpretation of the contract.

incorrectly defined the relevant geographic market area for the tying product.[3]

*Tying Arrangement*

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. . . ." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The existence of a tying arrangement in this case has never been seriously disputed by appellees, since it is clear that users of the hospital's operating rooms (the tying product) are also compelled to purchase the hospital's chosen anesthesia service (the tied product). It is also clear that we are dealing with two distinct services which a buyer should be able to obtain separately. Our inquiry does not end here; tying arrangements are only proscribed by the Sherman Act when they exhibit the following four characteristics:

(1) two separate products, the tying product and the tied product;

(2) sufficient market power in the tying market to coerce purchase of the tied product;

(3) involvement of a not insubstantial amount of interstate commerce in the tied market; and

(4) anticompetitive effects in the tied market.

*Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981). The United States Supreme Court recognized many years ago that "the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not." *Northern Pacific Ry. v. United States*, 356 U.S. at 11, 78 S.Ct. at 521.

The district judge ruled against appellant on precisely this point. He found that appellant had failed to demonstrate that the hospital dominated the market for its services. However, as the following language from the United States Supreme Court's opinion in *Northern Pacific Ry. v. United States, supra*, demonstrates, market domination is not required:

> While there is some language in the Times-Picayune opinion which speaks of "monopoly power" or "dominance" over the tying product as a necessary precondition for application of the rule of per se unreasonableness to tying arrangements, we do not construe this general language as requiring anything more than sufficient economic power to impose an appreciable restraint on free competition in the tied product (assuming all the time, of course, that a "not insubstantial" amount of interstate commerce is affected). To give it any other construction would be wholly out of accord with the opinion's cogent analysis of the nature and baneful effects of tying arrangements and their incompatibility with the policies underlying the Sherman Act. Times-Picayune, of course, must be viewed in context with International Salt and our other decisions concerning tying agreements.

*Id.* at 11, 78 S.Ct. at 521.

Although appellant is correct in his assessment of the economic power necessary to sustain a finding of an illegal tying arrangement, the court's imperfect definition of the relevant geographic market for the hospital's services would prevent him from succeeding on this element, even when a less stringent economic power standard is applied. The court below made the following finding about the relevant geographic market area:

> A relevant geographic market is the market area in which the seller operates and to which the purchaser can practically turn for supplies. The evidence showed that 70% of the patients from the East Bank of Jefferson Parish go to hospitals in the metropolitan Orleans area

3. Since we base our decision today exclusively on Section 1 of the Sherman Act, we do not unnecessarily recite the other portions of the lower court's judgment and appellant's challenges thereto.

other than East Jefferson. The data presented by the New Orleans Area/Bayou River Health System shows large numbers of Jefferson residents go to hospitals in the New Orleans area such as Mercy, Baptist and Touro Hospitals and Hotel Dieu. Therefore plaintiff must show that East Jefferson dominated the market which at least includes the Orleans Parish hospitals which are located on the East Bank.

Record on Appeal, vol. 2, at 246–47.

The court applied a traditional method of economic analysis in this case, recognizing that surgeons have the option of admitting their patients to other hospitals and that patients have a similar right to go to another hospital if they are at all dissatisfied with the anesthesia service offered at East Jefferson Hospital. The contract at issue here involved only one hospital out of at least twenty in the area. Under the analysis applied to a truly competitive market, appellant has failed to prove an illegal tying arrangement. In *U. S. Steel v. Fortner Enterprises*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), the Supreme Court framed the inquiry as

> whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.
>
> Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases.

*Id.* at 620–21, 97 S.Ct. at 867–68 (footnotes omitted).

Not only the court defined market power standard, but also the area within which the court finds that power operates, determine the extent of the hospital's actual power. If both patient and surgeon are free to go to any one of a large number of competent institutions, from whence, appellees ask, does the hospital derive the power to force the tied product upon consumers?

The foregoing analysis assumes that the health care industry functions as a competitive market in the same sense as the industries involved in the plethora of other tying cases and should be subject to the same standards.[4] This is not correct. Several market imperfections in the health care industry favor public, non-profit entities like East Jefferson Hospital. First, the prevalence of third party payment of bills eliminates a patient's incentive to compare the relative cost effectiveness of competing hospitals. A second market imperfection is the lack of complete information regarding the quality of medical care offered. Since a patient cannot realistically compare the quality of medical care, he is likely to purchase his medical care from a non-profit entity that has no apparent profit motive to cut quality. It is not surprising that these factors lead patients to select the hospital closest to home, a preference which the court below noted:

> It is likely that any individual will choose to go to the hospital closest to his home if it is possible to do so for the convenience of the family. Persons living nearer to hospitals in other areas will choose to go to these hospitals if possible.

Record on Appeal, vol. 2, at 247–48.

The fact that patients tend to choose hospitals by location rather than price or quality, means that the geographical market area for each hospital is much smaller than the district court found. In this case, the court below, while recognizing in one breath patients' preference for hospitals close to home, required appellant to show the economic power of the hospital in a large market area which includes at least twenty other hospitals. We cannot recon-

4. *See, e.g., U. S. Steel v. Fortner*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *Northern Pacific Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *IBM Corp. v. United States*, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

cile the judge's findings here; we conclude, therefore, that the judge erred when he defined the geographical market area.[5] Since nearly one-third of the patients from the entire East Jefferson Area go to East Jefferson Hospital, we hold that the hospital does have sufficient market power in the tying market to coerce purchase of the tied product. The propriety of holding that the relevant geographical market area is the East Bank of Jefferson Parish is further shown by the limitation placed on the East Jefferson Hospital Board by state law to serve only the East Bank of Jefferson Parish. The Hospital Board is directed by La.R.S. 46:1055 "[t]o represent the public interest in providing hospital and medical care *in the district.*"

In the course of presenting his case that the exclusive contract between the hospital and Roux and Associates violates the Sherman Anti-Trust Act, Dr. Hyde pointed out a number of "anticompetitive" effects that flow from the agreement. Basic to a discussion of these effects is an understanding of the manner in which the specialty of anesthesiology is practiced. Although the specialty of anesthesiology is indeed a very important and demanding one, the anesthesiologist is only involved in the medical decision-making process after the initial decision between patient and surgeon that surgery is the indicated course of treatment.[6] It is not surprising, therefore, that an anesthesiologist is normally selected by the surgeon, rather than the patient, based on familiarity gained through a working relationship. Obviously, the surgeons who practice at East Jefferson Hospital do not gain familiarity with any anesthesiologists other than Roux and Associates. Dr. Hyde argues that his is an especially egregious case because he has a more personal relationship with a great number of his patients than many anesthesiologists. This is because he specializes in obstetric anesthesiology and, more particularly, the administration of epidural anesthetics. The exclusive contract, therefore, prohibits patients as well as surgeons from selecting him. Another twist which is important to an understanding of the specialty is that more than in any other medical specialty, anesthesiologists have been confronted with the growth of a paraprofessional counterpart—the anesthetist. Herein lies the actual basis for the hospital's actions in this case.[7] While it is true that the tying of anesthesia services to operating rooms in the instant case did not lead to a higher charge for anesthesia services, it accomplished just as dramatic an effect by increasing the hospital's profit. The hospital realizes a substantial profit from its practice of supplementing a small contract group of anesthesiologists with a much larger group of lower priced anesthetists. Furthermore, this practice lacks candor; the patient is not informed that he will be billed for the services of an anesthesiologist who may have had very little contact with his case.[8]

The exclusive contract spawns a number of anticompetitive effects.[9] First,

5. Amicus curiae, the Louisiana Medical Society, properly points out that this is not the figure which is important for this case. The court should have determined the geographic market in which the hospital competes for the provision of *surgical* facilities. In light of our resolution of the geographic market issue, however, we need not remand the case for a more specific finding.

6. We recognize that anesthesiologists do work with specialists other than surgeons. However, the vast majority of their work is done in conjunction with surgery; this is the basis for our generalization.

7. The district judge's determination that strictly quality considerations led the hospital to enter into an exclusive contract is clearly erroneous. Doctor Roux even testified as to the invalidity of the major justification put forth by the hospital. The district court's finding leaves this Court with the clear conviction that a mistake has been committed and is, for that reason, set aside.

8. This discussion is by no means intended to denigrate the competence of nurse anesthetists. We simply make note of the all too common practice of an anesthetist performing services which are later billed by an anesthesiologist.

9. Appellees contend that this contract does not stifle competition, but simply places the competition at a different point. They state that anesthesiology groups compete for this contract, and this ensures high quality and reason-

the tie prevents anesthesiologists from entering that part of the anesthesia services market which the hospital controls. This prohibition of competition not only serves indirectly to artificially limit the number of anesthesiologists in the area, but, more importantly, it reduces the incentive for improving or initiating techniques or procedures. Quality is lowered by this restraint while at the same time the hospital's profit, as demonstrated above, is raised. In the instant case, there was also testimony that the profit motive caused the hospital to hire nurse anesthetists in place of needed anesthesiologists, a practice which dilutes the professional coverage available. Secondly, the tie eliminates the surgeon or patient's choice of anesthesiologist at this hospital. Since one goal of antitrust law is to allow the consumer to make buying decisions without being subject to economic coercion, this anticompetitive effect is significant in a market where location tends to govern the choice of hospital.[10]

■ Despite the *per se* characterization of this arrangement, appellees maintain that the business justifications for the contract should insulate them from liability. This Court has recognized such a limited defense in tying arrangement cases, but appellees misstate its scope. An illegal tying arrangement will never be excused if there is a less restrictive way to accomplish the end which the business justification purports to serve. *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 47 (5th Cir. 1976). The hospital's justifications for the contract must be examined in this light. A major justification for the contract—to insure continuous coverage—must be eliminated because Dr. Roux testified that he would provide twenty-four hour a day service without a contract. The argument that the contract facilitates the use of operating rooms must also be rejected, since appellees are unable to demonstrate why there is more lag time when additional anesthesiologists are permitted to practice at the hospital. Similarly, the business justification based on the use of specialized equipment and nurse supervision must also fall since appellees fail to successfully bear the burden of demonstrating the superior ability of the closed group in this regard. Any anesthesiologist who sought to practice at this hospital would still have to be approved by the medical staff. This procedure was set up, after all, to screen out the incompetent doctors unable to handle such tasks. Monitoring of the professional competence of the anesthesiologists, another asserted business justification, can be accomplished by the much less restrictive means of relying upon the medical staff, which is already set up to provide this service. The need to place the responsibility for development and management of the department upon one individual can also be accomplished without an exclusive contract. In sum, appellees have failed to provide this Court with one reason for the exclusive contract which could not be resolved by a much less drastic solution.

### *Per Se Liability*

Although this practice must be properly characterized as an illegal tying arrangement, appellees argue for a rejection of the

able price for the services. We make no comment on the merits of this assertion because the hospital, in fact, has not permitted this competition since the original contract was signed over ten years ago.

10. The fourth element necessary to prove an illegal tying arrangement requires a finding of the amount of interstate commerce involved. A finding that "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie...," *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 501, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969), will satisfy this test. The director of operating rooms at East Jefferson Hospital testified at trial that approximately 875 operations per month were performed at the hospital. Record on Appeal, vol. 2, at 236. Even if one uses the very conservative figure of $100 for anesthesia services, the sum of commerce foreclosed in a year's time amounts to over a million dollars. The district court recognized that a significant portion of the sum came through the channels of interstate commerce. The court also noted that supplies and medicine for the department are often provided by out-of-state sellers. Record on Appeal, vol. 2, at 240–41. We leave this finding undisturbed.

stringent *per se* rule of liability traditionally applied in such cases. As justification for this departure from established precedent, they assert that since the judiciary has had little antitrust experience in the health care industry, a rule of reason approach is preferable.[11] They also contend that the professional nature of the services mandates a rejection of the rigid *per se* rule. The Supreme Court's recent opinion in *Arizona v. Maricopa County Medical Society,* — U.S. —, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), however, forecloses both arguments. That decision dealt with the *per se* rule as applied to price-fixing in the health care industry; its rationale is equally applicable to tying arrangements.[12]

> Nor does the fact that doctors—rather than nonprofessionals—are the parties to the price fixing agreements support the respondents' position. In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 788, n.17 [95 S.Ct. 2004, 2013, n.17, 44 L.Ed.2d 572] (1975), we stated that the "public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." See *National Society of Professional Engineers v. United States,* 435 U.S. 679, 696 [98 S.Ct. 1355, 1367, 55 L.Ed.2d 637] (1978). The price fixing agreements in this case, however, are not premised on public service or ethical norms. The respondents do not argue, as did the defendants in *Goldfarb* and *Professional Engineers,* that the quality of the professional service that their members provide is enhanced by the price restraint. The respondents' claim for relief from the *per se* rule is simply that the doctors' agreement not to charge certain insureds more than a fixed price facilitates the successful marketing of an attractive insurance plan. But the claim that the price restraint will make it easier for customers to pay does not distinguish the medical profession from any other provider of goods or services.
>
> We are equally unpersuaded by the argument that we should not apply the *per se* rule in this case because the judiciary has little antitrust experience in the health care industry. The argument quite obviously is inconsistent with [*U. S. v.*] *Socony-Vacuum* [*Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129]. In unequivocal terms, we stated that, "[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." 310 U.S., at 222 [60 S.Ct. at 843]. We also stated that "[t]he elimination of so-called competitive evils [in an industry] is no legal justification" for price fixing agreements, *id.,* at 220, [60 S.Ct. at 843] yet the Court of Appeals refused to apply the *per se* rule in this case in part because the health care industry was so far removed from the competitive model. Consistent with our prediction in *Socony-Vacuum, id.,* at 221 [60 S.Ct. at 843] the result of this reasoning was the adoption by the Court of Appeals

11. In *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), Justice Brandeis set forth the following classic statement of the rule of reason:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Id.* at 238, 38 S.Ct. at 244.

12. The courts have declared the following practices unlawful in and of themselves and, therefore, subject to the *per se* rule: price fixing, division of markets, groups boycotts, and tying arrangements. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

of a legal standard based on the reasonableness of the fixed prices, an inquiry we have so often condemned. Finally, the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pac. R. Co. v. United States, supra,* [356 U.S.] at 5 [78 S.Ct. at 518].

102 S.Ct. at 2475–77.

Similarly unpersuasive to the Supreme Court in *Arizona v. Maricopa County* was defendant's principal argument that the agreements should be immune from *per se* liability because of the procompetitive justifications therefor, an argument which is urged strenuously in this appeal.[13] The asserted procompetitive justifications for the exclusive contract between the hospital and Roux and Associates are identical to the business reasons which were proposed to justify the contract. The following quote demonstrates why the procompetitive justifications offered by appellees do not warrant a departure from the *per se* rule.

> The argument indicates a misunderstanding of the *per se* concept. The anticompetitive potential inherent in all price fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some. Those claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application. Even when the respondents are given every benefit of the doubt, the limited record in this case is not inconsistent with the presumption that the respondents' agreements will not significantly enhance competition.

102 S.Ct. at 2477 (footnote omitted).

*Conclusion*

Inasmuch as we declare that this exclusive contract creates an illegal tying arrangement, we must also grant the requested injunction and permit Dr. Hyde to practice his chosen profession. The medical staff at East Jefferson Hospital highly recommended that he be granted staff privileges.[14] The refusal of the hospital board to grant staff privileges was based on the existence of the exclusive contract with Roux and Associates.

13. The Court concluded that this argument was more properly directed to Congress:

> Our adherence to the *per se* rule is grounded not only on economic prediction, judicial convenience, and business certainty, but also on a recognition of the respective roles of the Judiciary and the Congress in regulating the economy. *United States v. Topco Associates, Inc., supra,* [405 U.S. 596] at 611–612 [92 S.Ct. 1126 at 1135, 31 L.Ed.2d 515]. Given its generality, our enforcement of the Sherman Act has required the Court to provide much of its substantive content. By articulating the rules of law with some clarity and by adhering to rules that are justified in their general application, however, we enhance the legislative prerogative to amend the law. The respondents' arguments against application of the *per se* rule in this case therefore are better directed to the legislature. Congress may consider the exception that we are not free to read into the statute.

*Id.* 102 S.Ct. at 2478–79 (footnote omitted).

14. We concur with the following statement from *Sosa v. Board of Managers of Val Verde Hospital,* 437 F.2d 173 (5th Cir. 1971), about the propriety of judicial restraint where the professional and ethical competence of a physician is concerned.

> In the instant case there was considerable evidence regarding Dr. Sosa's ethical and professional competency. No court should substitute its evaluation of such matters for that of the Hospital Board. It is the Board, not the court, which is charged with the responsibility of providing a competent staff of doctors. The Board has chosen to rely on the advice of its Medical Staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff.

*Id.* at 177.

This opinion does not test the limits of access to staff privileges. Certainly, the staff size of each hospital is bounded by legitimate concerns of overcrowding, overtaxing of hospital personnel and resources, and the consequent decline in quality of patient care. In the instant case, however, it was not the size of the department which concerned the hospital board, but the profit which the current structure generated. In addition, the concerns which allegedly led to the implementation of the exclusive contract can be addressed by much less restrictive alternatives. They furnish an illusory basis for depriving a physician of the right to practice his profession.

For the reasons set forth above, the district court's judgment in this matter is reversed.

REVERSED.