JOSE BELMAR, M.D., PLAINTIFF-APPELLANT, v. JOSEPH CIPOL-
LA, M.D., SHIH-PIAU HSU, M.D., WELLINGTON HSIA, M.D.,
ANESTHESIA ASSOCIATES, A PARTNERSHIP, AND COMMU-
NITY HOSPITAL GROUP, INC., A CORPORATION ORGAN-
IZED AND EXISTING UNDER THE LAWS OF THE STATE OF
NEW JERSEY, T/A JOHN F. KENNEDY MEDICAL CENTER,
DEFENDANTS-RESPONDENTS.

ARMANDO SULIT, M.D. AND YING BANG LIN, M.D., PLAIN-
TIFFS-APPELLANTS, v. JOSEPH CIPOLLA, M.D., SHIH-PIAU
HSU, M.D., WELLINGTON HSIA, M.D., ANESTHESIA ASSOCI-
ATES, A PARTNERSHIP, AND COMMUNITY HOSPITAL
GROUP, INC., A CORPORATION ORGANIZED AND EXISTING
UNDER THE LAWS OF THE STATE OF NEW JERSEY, T/A
JOHN F. KENNEDY MEDICAL CENTER, DEFENDANTS-RE-
SPONDENTS.

Argued November 7, 1983—Decided May 29, 1984.

*James J. Higgins* argued the cause for appellants (*Boyar & Higgins*, attorneys).

*Howard Gran* argued the cause for respondents Joseph M. Cipolla, M.D., Shih-Piau Hsu, M.D., Wellington Hsia, M.D., and Anesthesia Associates (*Abrams, Dalto, Gran, Hendricks & Reina*, attorneys).

*Stephen L. Abbott* argued the cause for respondent Community Hospital Group, Inc. (*Toolan, Romond, Abbott & Domenichetti*, attorneys).

*Mary K. Brennan* argued the cause for *amicus curiae* New Jersey Hospital Association (*Winne, Banta & Rizzi*, attorneys; *Peter G. Banta*, of counsel; *Robert M. Jacobs*, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

This case presents the question whether a hospital may enter into an exclusive contract with an anesthesiologist or group of anesthesiologists for the provision of all anesthesiological services at the hospital. In an unreported decision, the Chancery Division approved the right of the hospital to enter into such an exclusive contract and therefore dismissed plaintiffs' complaint that challenged the agreement. The Appellate Division affirmed, also in an unreported decision. We now affirm the judgment of the Appellate Division.

I

Plaintiffs, Jose Belmar, Armando Sulit, and Ying Bang Lin (plaintiff doctors), like the individual defendants, Joseph Cipolla, Shih-Piau Hsu, and Wellington Hsia (defendant doctors), are medical doctors and former partners in the defendant partnership, Anesthesia Associates. Defendant Community Hospital Group, Inc. (Community), a nonprofit corporation, operates John F. Kennedy Community Hospital (J.F.K.), the hospital where Anesthesia Associates practiced anesthesiology.

At the center of this case are two identical agreements signed on February 16, 1968 and renewed on June 8, 1978, between Community and defendant medical doctors Joseph A. Cipolla and Wellington Hsia. Originally, Community also signed a similar contract with Dr. Carlos Burgos, not a party to these proceedings, who resigned from the hospital in 1974 before the events that gave rise to this action.

In the agreements, Community guaranteed fees of "at least $135,000.00 for three anesthesiologists and $180,000.00 for four anesthesiologists." The contracts provided further that staff privileges would be granted to a limited number of physicians, originally set at four, who would comprise the anesthesiology department at J.F.K. Plaintiffs contend that the agreements were nothing more than minimum income guarantees.

Although the trial court noted that the arrangement between the parties was "somewhat haphazard," it found that the contracts contemplated that defendant doctors would have the exclusive right to provide anesthesiological services at the hospital. That finding is supported by substantial credible evidence and we sustain it. *Ramirez v. Autosport*, 88 *N.J.* 277, 290 (1982).

Specifically, the contracts provided that all anesthesia at J.F.K. "will be practiced without referrals." The effect of that provision was to prevent surgeons from requesting a particular anesthesiologist for an operation. The provision was important to the defendant doctors, who believed that referrals gave individual surgeons too much control over anesthesiologists' schedules and compensation. From prior experience, the anesthesiologists also thought that the referral system bred discontent in an anesthesiology department.

In exchange, the hospital received the assurance from the doctors that they would not provide anesthesia services at any other hospital and that they would provide those services at J.F.K. "in the operating room on a 24-hour basis." The hospital retained control over the department through a provision for

cancellation on one-year's notice during the first year and on six-months' notice thereafter. Also, the doctors agreed to be bound by the "Medical Staff By-laws, Rules and Regulations." Among other things, the bylaws contained detailed provisions concerning "corrective action," including notice, hearing, and the right to appeal within the governing body of the hospital.

The trial court found that hospitals generally staff an anesthesiology department in one of three ways: an open staff, a non-exclusive closed staff, or through an exclusive contract. Under an open staff arrangement, any anesthesiologist who meets the hospital's professional qualifications is granted staff privileges. A hospital with a non-exclusive closed staff has a maximum number of available positions, and it may award staff privileges until reaching the maximum number. Under both open and closed staff arrangements, staff members provide the necessary coverage for anesthesia services.

The Community Board of Governors, acting on the advice of the hospital's executive director, made the policy decision before opening J.F.K. that the radiology, pathology, and anesthesiology departments should operate under exclusive contracts. According to the executive director, an experienced hospital administrator, the advantages of an exclusive contract for anesthesiology included "better use of * * * operating room personnel," the ability "to process more operative procedures," the avoidance of "fee splitting that exists between surgeon and anesthesiologist," and "better coverage in terms of 24 hour coverage."

When a hospital enters into an exclusive contract, the contracting anesthesiologists assume many, if not most, of the administrative responsibilities of running an anesthesiology department. At J.F.K. those responsibilities included hiring and firing personnel, establishing department procedures, distributing cases, collecting fees, paying bills, scheduling vacations, and determining the compensation of the anesthesiologists. As the trial court found, exclusive contracts "are not uncommon

and apparently provide the structure for stability and accountability in the provision of anesthesiology services in many hospitals. They certainly take an administrative load off the shoulders of administrators * * *."

On the day before signing their contracts with Community, Drs. Cipolla, Hsia, and Burgos entered into a partnership, Anesthesia Associates, by signing an "Agreement between the members of the department of anesthesiology of John F. Kennedy Community Hospital." The partnership agreement, which was less formal than the agreement with Community, provided for the collection of fees, payment of expenses, and equal division of net profits. Consistent with the hospital regulation that required a department director to be board certified, the agreement provided that a board certified anesthesiologist was to be the chief of the department. The department chief, also known as the director or chairman, was to represent the department at hospital meetings and schedule "daily cases." In fact, Drs. Cipolla and Hsia were the only board certified members of the group and they alternated serving as department chairman. The partners also agreed to share equally in the department's work and, consistent with the contract between defendant doctors and Community, agreed not to honor individual referrals of patients from other doctors. In brief, all anesthesiological work at the hospital was to be channeled through the partnership.

Over the years the department grew, and various anesthesiologists joined and left the staff. The partnership interviewed and recommended doctors for appointment, subject to the hospital's review for competency and proper credentials. Similarly, either the partnership or the hospital could terminate the privilege of practicing anesthesiology at J.F.K. These facts support the finding of the trial court that "[t]he exclusive contract gave Drs. Hsia and Cipolla the right to terminate members of the department."

Dr. Belmar joined the group as an employee in May 1968, and by year-end he was a partner. However, he refused to sign either the partnership agreement or a contract with Community. The trial court, rejecting his claim that he did not know of any contractual arrangements, found that Dr. Belmar's conduct during his association with the department could be understood only by reference to the exclusive contract between Community and the defendant doctors. With specific reference to the contract, the trial court stated, "I am fully persuaded Dr. Belmar knew it existed, participated in its administration, abided by and prospered within its structures and was fully aware not only that it existed, but that his association with the hospital was controlled by it." The trial judge found further that Drs. Sulit and Lin also knew that the department operated under an exclusive contract with the hospital.

Plaintiff Drs. Sulit and Lin joined the department in 1978 with an assurance of full partnership after a two-year probationary period. Shortly before the end of that period, however, Drs. Cipolla and Hsia offered them a "junior partnership." After negotiations, in which Dr. Belmar became embroiled, the parties agreed that Drs. Sulit and Lin would become partners and receive 85% of a full share.

Throughout its life, the partnership was fraught with disharmony. In particular, the trial court found that Dr. Belmar "was a divisive and uncooperative factor in the department." That court further found "as a fact that Dr. Belmar's conduct in the department was uncooperative, abrasive and stubborn."

Finally, on June 8, 1978, Dr. Cipolla sent a letter to Drs. Belmar, Hsu, and Hsia dissolving the partnership. Thereupon Drs. Cipolla, Hsia, Hsu, Sulit, and Lin formed a new partnership known as J.F.K. Anesthesia Associates (J.F.K. Associates). A year later, however, in June 1979, Drs. Sulit and Lin withdrew from J.F.K. Associates and formed a new partnership with Dr. Belmar. The defendant doctors retained control of the scheduling of cases, and as time went on, Drs. Sulit, Lin, and

Belmar received fewer and fewer cases. Although the hospital did not formally terminate plaintiffs' staff privileges, the department's control of the cases prevented the plaintiff doctors from exercising their privileges. Toward the end of 1979, the plaintiff doctors requested the hospital to terminate the contractual arrangement with the defendant doctors and "open up" the anesthesia department to all anesthesiologists with hospital privileges.

Friction developed between the two groups, and the conflict spread to the operating room. The hospital formed a grievance committee to mediate the controversy, but eventually the executive director advised the Board of Trustees that "it was extremely difficult for us to operate with two separate groups and still maintain an efficient operation * * *. The groups are not speaking with one another and are literally fighting with one another * * *. This situation is affecting the hospital—scheduling of time off is not being coordinated, etc." Consequently, at a meeting of the hospital board of trustees on November 27, 1979, the board unanimously adopted a resolution "to continue the contract with Dr. Cipolla as it is in effect now and have the Anesthesia Associates cover us with qualified people twenty-four hours a day." By February 1980, the defendant doctors had hired other doctors to replace the plaintiff doctors, who were excluded from the assignment schedule.

The plaintiff doctors instituted separate actions seeking damages and an accounting from the defendant doctors and damages and an injunction against Community. In amended complaints filed one day before the pretrial conference, the plaintiff doctors asserted further that the contractual arrangement between the defendant doctors and the hospital violated the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 to –19.

The trial court sitting without a jury found that "exclusive contracts may be debatable but they are not unlawful. Hospitals have a broad range of discretion within which to structure the delivery of health services. Only if they act arbitrarily or

grossly against the public interest can they be judicially correct-
ed." The court found further that Community entered into an
exclusive contract with Dr. Hsia and Dr. Cipolla, that "the
exclusive contract gave Drs. Hsia and Cipolla the right to
terminate members of the department," and that termination of
the partnership agreement was not wrongful. The belated
assertion of antitrust violations was not the subject of specific
testimony at the trial or of separate findings by the trial court.
At the conclusion of the entire case, the trial court dismissed
both complaints with costs.

## II

Analysis of the legal consequences of the relationships be-
tween the parties requires some comprehension of the nature
and function of a modern hospital. To say that a hospital is a
place where sick people receive medical and surgical treatment
is accurate but incomplete. In providing necessary treatment,
a hospital must have available numerous doctors, nurses, and
attending staff. It must provide operating, recovery, and pa-
tient rooms; as well as medicines, food, beds, and support
equipment. Payment of hospital bills by third-party payors
(private insurance companies or governmental agencies) re-
quires a complicated billing and collection system. State and
federal regulations add to the administrative burden. In short,
a hospital is a complex business vitally affected with a public
interest.

From another perspective, a hospital is a work place for
hundreds of people who care for patients, maintain and operate
the plant and equipment, and conduct the business of a compli-
cated health care facility. Included in the wide range of
professionals who work at a hospital are doctors. For some
doctors, such as surgeons and anesthesiologists, a hospital may
be the primary place to practice their profession. Consequent-
ly, staff privileges, which are crucial to their practice, create
judicially-protected interests, such as the right to procedural

due process. *See Greisman v. Newcomb Hosp.*, 40 *N.J.* 389, 403–04 (1963). A doctor's opportunity to pursue his or her profession at a hospital may depend on more than the grant of staff privileges. Many hospitals contract with third parties for the provision of certain services, such as emergency room treatment, radiology, and anesthesiology. Such contracts can affect the ability of doctors to practice at a particular hospital.

██ No matter what arrangement a hospital may have with doctors, its primary purpose remains to serve the public. *Garrow v. Elizabeth Gen. Hosp. and Dispensary*, 79 *N.J.* 549, 557 (1979); *see Greisman, supra*, 40 *N.J.* at 404. As long as those entrusted with the management and governance of a hospital make reasonable decisions .consistent with the public interest, their decisions should be respected. *Doe v. Bridgeton Hosp. Ass'n, Inc.*, 71 *N.J.* 478, 489 (1976). Consequently, courts normally do not interfere with a reasonable management decision concerning staff privileges as long as that decision furthers the health care mission of the hospital. *Greisman v. Newcomb Hosp., supra*, 40 *N.J.* at 403–04.

██ Nonetheless, hospitals must adopt rules, regulations, and bylaws concerning procedures for admission to staff membership, *N.J.A.C.* 8:43B–6.2, and they may not arbitrarily prevent otherwise qualified doctors from exercising staff privileges. *Greisman v. Newcomb Hosp., supra*, 40 *N.J.* at 403–04; *Doe v. Bridgeton, supra*, 71 *N.J.* at 489. Additionally, a hospital has a right and a duty not only to review the qualifications of doctors, but also to consider the need for and impact of additional doctors on the hospital's staff and patients. In balancing the interests of the hospital management with those of a doctor who desires to practice at the hospital:

Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of

the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. [*Greisman v. Newcomb Hosp., supra,* 40 *N.J.* at 403–04].

When striking the balance, hospitals are constrained not only by judicial decisions but also by statutes and administrative regulations. Regulations adopted pursuant to the licensing statute, *N.J.S.A.* 30:11–1 to –26, require the hospital to appoint an organized medical staff responsible to the governing board. *N.J.A.C.* 8:43B–6.1 to –6.6. Other requirements oblige a hospital to provide an anesthesia department, *N.J.A.C.* 8:43B–1.-11(q)(12), to provide a physician to direct those services, *N.J.A.C.* 8:43B–1.11(q)(12)(i), and to provide a system to assure sufficient personnel for emergency needs. *N.J.A.C.* 8:43B–1.-11(q)(12)(iii).

Although essential to many medical procedures, the practice of anesthesiology differs from other medical and surgical specialities. The record reveals that generally the surgeon or other primary care physician, not the anesthesiologist, admits the patient, who expects that physician or the hospital to arrange for ancillary services such as anesthesia. Patients rarely select an anesthesiologist and in most, if not all, cases, a patient desires anesthesia only in connection with another procedure.

To a certain extent, surgeons are sources of business for anesthesiologists, who may compete for referrals. Conversely, surgeons may conclude that they can exert unreasonable demands on a favored anesthesiologist. For example, Dr. Cipolla testified that when he practiced under an open system, he would sometimes be called back from vacation by a surgeon, under the threat of loss of future referrals, to administer anesthesia to the surgeon's patient, although other anesthesiologists were on duty and available. Competition for business from surgeons can breed dissension among anesthesiologists, even when they are partners. Sometimes, as occurred at

J.F.K., a department of anesthesiology may become a hotbed of discontent.

Although the experts at trial differed about the relative advantages and disadvantages of the exclusive contract between Community and defendant doctors, all agreed that an exclusive contract was a recognized method of providing anesthesiology services. At trial, plaintiffs relied on an amendment to the statement of policy of the American Society of Anesthesiologists that disapproves exclusive contracts between hospitals and anesthesiologists. The statement, apparently adopted in response to the use of nurse anesthetists by some hospitals, is advisory only and does not subject contracting anesthesiologists to ethical sanctions.

Nonetheless, Dr. Belmar wrote letters complaining of the conduct of the defendant doctors to the State Board of Medical Examiners, the Federal Trade Commission, the Middlesex County Medical Society, the New Jersey Society of Anesthesiologists, and the American Society of Anesthesiologists, none of which found that the doctors had committed any ethical violations.

No one criticized the quality of anesthesia services at J.F.K. or asserted that the cost of anesthesia would be reduced under a different arrangement. An exclusive contract, nonetheless, is not the only acceptable method of providing anesthesia services. Hospitals must have latitude in exercising their management discretion and, depending on the circumstances, a different arrangement might also be reasonable. That conclusion is consistent with the position taken in these proceedings by the Attorney General who, in declining our invitation to participate in this appeal, wrote that the Department of Health was "neutral" on the subject of exclusive contracts between hospitals and physicians engaged in specialities such as anesthesiology. The Attorney General advised further that the department had "no regulatory preference for a particular staffing structure."

By retaining control over the grant or termination of privileges, Community also retained control over the competency of the anesthesiologists at J.F.K. Both the hospital and the department were interested in the qualification of anesthesiologists. The hospital made the policy choice, a reasonable one in light of its experience and that of the defendant doctors, to allow the partnership to control the hiring and firing of anesthesiologists.

■ The evidence points to the conclusion that the decision to enter an exclusive contract for the provision of anesthesia services was motivated by the hospital's desire to insure a high standard of medical care. In reaching that decision, the hospital considered that the benefits of the contract outweighed any limitation on the freedom of choice of surgeons or patients to select a particular anesthesiologist. Those benefits included 24-hour-a-day coverage and more efficient use of operating rooms, the easing of tension among staff doctors, and a reduction in administrative problems. Under the circumstances, the decision to enter an exclusive contract was a reasonable choice, and the contract does not violate public policy.

That conclusion comports with decisions of other jurisdictions holding that similar exclusive arrangements with various medical specialists represent the reasonable exercise of discretion by the hospital governing body. *See, e.g., Capili v. Shott*, 487 *F.Supp.* 710 (S.D.W.Va.1978), *aff'd*, 620 *F.*2d 438, 439 (4th Cir.1980) (decision to enter an exclusive contract for anesthesia services by a public hospital had a rational basis and therefore did not unlawfully discriminate against non-contract doctors); *Centeno v. Roseville Community Hosp.*, 107 *Cal.App.*3d 62, 167 *Cal.Rptr.* 183 (Ct.App.1979) (governing body's policy decision to enter an exclusive contract for radiology services does not arbitrarily or unreasonably exclude otherwise qualified radiologists from staff membership); *Lewin v. St. Joseph Hosp. of Orange*, 82 *Cal.App.*3d 368, 146 *Cal.Rptr.* 892 (Ct. App.1978) (decision of governing authority to operate chronic renal hemodialysis facility under exclusive arrangement with a

single group of nephrologists was substantively rational); *Letsch v. Northern San Diego County Hosp. Dist.*, 246 *Cal. App.*2d 673, 55 *Cal.Rptr.* 118 (Ct.App.1967) (exclusive contract for radiology is reasonable and does not unlawfully interfere with excluded physician's right to practice medicine); *Blank v. Palo Alto-Stanford Hosp. Center*, 234 *Cal.App.*2d 377, 44 *Cal.Rptr.* 572 (Ct.App.1966) (exclusion of applicant from staff because of an exclusive contract for diagnostic radiology is justified); *Radiology Professional Corp. v. Trinidad Area Health Assoc.*, 195 *Colo.* 253, 577 *P.*2d 748 (1978) (exclusive contracts with certain specialists are not invalid); *Anne Arundel Gen. Hosp., Inc. v. O'Brien*, 49 *Md.App.* 362, 432 *A.*2d 483 (Ct.Spec.App.1981) (exclusive contracts for radiology services are not invalid); *Benell v. City of Virginia*, 258 *Minn.* 559, 104 *N.W.*2d 633 (1960) (resolutions mandating consultation with hospital-employed radiologist did not unlawfully interfere with physician's right to treat his patients); *Adler v. Montefiore Hosp. Ass'n of Western Pennsylvania*, 453 *Pa.* 60, 311 *A.*2d 634 (1973) (limitation of use of cardiology laboratory to full-time laboratory director was reasonable exercise of hospital officials' judgment).

### III

On the day before the pretrial conference, plaintiffs amended their complaint to assert a violation of the New Jersey Antitrust Act. Plaintiffs' claim was predicated upon *N.J.S.A.* 56:9–3 that provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful."

The plaintiff doctors claimed that the exclusive contract constituted an illegal tying arrangement resulting in a *per se* violation of that act. The essential allegation is that Community has unlawfully tied the sale of other hospital services, particularly surgery (the tying service), to the sale of anesthesiological services (the tied service).

At the trial, which began five weeks after the pretrial conference, plaintiffs offered no witnesses to testify specifically about the antitrust issues. Instead, they introduced, over objection of defense counsel, sixteen pages from a long-range plan of J.F.K. The plan, which reflected the presence of four other hospitals within a ten-mile radius of J.F.K., contained a market share analysis demonstrating that J.F.K. had 45.3% of the share of the market in its "primary area" (consisting of the municipalities of Edison, Metuchen, and Woodbridge) and 18.4% of the market in its "secondary area" (consisting of Carteret, Highland Park, Piscataway, and South Plainfield). No witness identified or testified about the preparation of the report. The record is barren of any explanation of the report's naked conclusions concerning patient admissions, market share (presumably, potential patients), or other data.

Despite the perfunctory proof at trial, plaintiffs pressed their antitrust claims before us, primarily relying on the decision of the United States Circuit Court of Appeals for the Fifth Circuit in *Hyde v. Jefferson Parish Hosp. Dist. No. 2*, 686 *F.*2d 286 (5th Cir.1982), which had been decided while plaintiffs' appeal was pending in the Appellate Division.

In *Hyde*, East Jefferson Hospital entered an exclusive contract with Roux Associates for the operation of an anesthesiology department. Although a subsequent agreement omitted the exclusivity clause, the hospital continued to treat Roux, who employed nurse anesthestists as well as anesthesiologists, as the exclusive provider of anesthesiological services. Accordingly, the hospital denied staff privileges to Hyde, who alleged that the contract was an illegal tying arrangement in violation of section 1 of the Sherman Act. That section, which was the model for *N.J.S.A.* 56:9–3, states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 *U.S.C.* § 1.

In dismissing Hyde's suit, the United States District Court found that the hospital's market area was the New Orleans metropolitan area, that the hospital competed with twenty other hospitals in that area, and that about 70% of the patients living in Jefferson Parish went to other hospitals. 513 *F.Supp.* 532, 542 (E.D.La.1981). The District Court concluded that East Jefferson Hospital lacked sufficient market power in the market for surgical facilities to constitute the arrangement illegal *per se.* *Id.* at 543. Applying a rule-of-reason analysis, the District Court concluded that the benefits of the exclusive arrangement—*e.g.,* improved round-the-clock coverage, standardization of procedures, and more cost-efficient operation of the department—outweighed Hyde's interest in practicing at the hospital. *Id.* at 544.

On appeal, the Circuit Court determined the relative market to be the east bank of Jefferson Parish, a smaller area than metropolitan New Orleans. 686 *F.*2d at 291. The Circuit Court found that 30% of the patients living in Jefferson Parish went to East Jefferson Hospital. *Id.* In view of "market imperfections" in the health care industry, the court concluded that the hospital had sufficient market power in the tying market (the hospital's operating room) to coerce purchasers of the tied product (anesthesia service). *Id.* at 290. The Circuit Court concluded that the tying arrangement was *per se* illegal and reversed the judgment of the District Court.

Until the Fifth Circuit decision in *Hyde,* the federal courts had unanimously rejected doctors' claims that hospital policies pertaining to staff privileges violated the federal antitrust laws. *Smith v. Northern Michigan Hosps., Inc.,* 703 *F.*2d 942, 954 (6th Cir.1983) (summary judgment for defendants under section 1 of Sherman Act affirmed as to hospital, but reversed and remanded under section 2 as to exclusive contractor for emergency room services); *DosSantos v. Columbus-Cuneo-Cabrini Med. Center,* 684 *F.*2d 1346, 1352–53 (7th Cir.1982) (in vacating preliminary injunction against enforcement of exclusive contract for anesthesiology services, Circuit Court has "serious

question" whether plaintiff will prevail at trial in establishing violation of rule-of-reason under section 1 of Sherman Act); *Harron v. United Hosp. Center, Inc., Clarksberg, W.Va.,* 522 *F.*2d 1133, 1134 (4th Cir.1975), *cert. denied,* 424 *U.S.* 916, 96 *S.Ct.* 1116, 47 *L.Ed.*2d 321 (1976) (claim that employment of single doctor to operate the radiology department invokes the Sherman Act termed "frivolous"); *Robinson v. Magovern,* 521 *F.Supp.* 842 (W.D.Pa.1981) (holding that denial of staff privileges to thoracic surgeon did not violate Sherman Act under either *per se* or rule-of-reason tests). Plaintiff doctors have been similarly unsuccessful in state courts. *See, e.g., Dattilo v. Tucson Gen. Hosp.,* 23 *Ariz.App.* 392, 533 *P.*2d 700 (Ct.App. 1975) (under rule-of-reason, exclusive contract for nuclear medicine does not violate state antitrust statutes and is valid under common-law precepts); *Centeno v. Roseville Community Hosp., supra,* 107 *Cal.App.*3d 62, 70–75, 167 *Cal.Rptr.* 183, 187–89 (Ct.App.1979) (exclusive contract for radiology services does not violate public policy or state statute against contracts in restraint of trade); *Blank v. Palo Alto-Stanford Hosp. Center, supra,* 234 *Cal.App.*2d 377, 44 *Cal.Rptr.* 572, 577 (exclusive contract for diagnostic radiology is not *per se* illegal and is not an unreasonable restraint of trade).

Since the date on which we heard oral argument, the United States Supreme Court has reversed the judgment of the Fifth Circuit in the *Hyde* case and remanded the matter to the United States District Court. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* —— *U.S.* ——, 104 *S.Ct.* 1551, 80 *L.Ed.*2d 2 (1984). Although all members of the Court voted for the judgment of reversal, it divided five-to-four on the appropriate rationale.

In an opinion by Justice Stevens, the majority observed that certain types of contractual arrangements—*e.g.,* price-fixing—"are deemed unreasonable as a matter of law," —— *U.S.* at ——, 104 *S.Ct.* at 1556, 80 *L.Ed.*2d at 10, and that "certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *per se.*" *Id.* Implicit in the condemnation of those tying arrangements is a finding

that the seller has the market power "to force a purchaser to do something that he would not do in a competitive market." —— *U.S.* at ——, 104 *S.Ct.* at 1559, 80 *L.Ed.*2d at 14. The Court stated that *per se* condemnation is appropriate only "if the existence of forcing is probable." —— *U.S.* at ——, 104 *S.Ct.* at 1560, 80 *L.Ed.*2d at 15.

The Court began its analysis of the market or markets in which the two products are sold. Focusing on the sale of services to patients, not on the contractual arrangement with the provider of anesthesiological services, Justice Stevens observed that the record established that Roux billed separately for anesthesia services and that patients or surgeons often requested specific anesthesiologists to come to the hospital to administer anesthesia. Hence, he found that anesthesiological services were separable from other services and that the arrangement presented a tying of two separate products.

That ruling, however, was only the beginning of the inquiry. The dispositive question was whether the hospital employed its market power to force "patients to use an unwanted anesthesiologist in order to obtain needed hospital services." —— *U.S.* at —— n. 40, 104 *S.Ct.* at 1565 n. 40, 80 *L.Ed.*2d at 21 n. 40. Noting that over 70% of the patients from East Jefferson Parish went to other hospitals, the Court stated that "[t]he geographic data does not establish the kind of dominant market position that obviates the need for further inquiry into actual competitive positions." —— *U.S.* at ——, 104 *S.Ct.* at 1566, 80 *L.Ed.*2d at 22. Justice Stevens found no evidence that the hospital forced anesthetic services on unwilling patients and he declined to find the tying arrangement to be unlawful *per se.* —— *U.S.* at ——, 104 *S.Ct.* at 1567, 80 *L.Ed.*2d at 23. Furthermore, Justice Stevens found insufficient evidence in the record to sustain a finding that the exclusive contract restrained competition. Although some patients and surgeons preferred other anesthesiologists, nothing indicated that a patient could not "go to a hospital that would provide him with the anesthesiologist of his choice." Granting staff privileges to Hyde would

have enlarged the range of choice by one doctor, but the hospital would retain the "unquestioned right to exercise some control over the identity and number of doctors to whom it accords staff privileges." —— *U.S.* at ——, 104 *S.Ct.* at 1568, 80 *L.Ed.*2d at 24. In this regard, the Court noted further deficiencies in the record concerning the effect of the exclusive "arrangement on price or quality of anesthesiological services." —— *U.S.* at —— n. 52, 104 *S.Ct.* at 1568 n. 52, 80 *L.Ed.*2d at 24 n. 52.

In the concurring opinion, Justice O'Connor, joined by three other members of the Court, urged abandoning the *per se* rule and refocusing "the inquiry on the adverse economic effects, and the potential benefits, that the tie may have." —— *U.S.* at ——, 104 *S.Ct.* at 1570, 80 *L.Ed.*2d at 27. She assumed that Jefferson Parish Hospital had market power in the provision of hospital services in its service area and that a substantial threat existed that it would acquire such power over anesthesiological services in that area. Nonetheless, she disagreed with the majority by concluding that "there is no sound economic reason for treating surgery and anesthesia as separate services." —— *U.S.* at ——, 104 *S.Ct.* at 1574, 80 *L.Ed.*2d at 31. Even if the services were viewed as separate, however, she concluded that no violation occurred because "tying here cannot increase the seller's already absolute power over the volume of production of the tied product, which is an inevitable consequence of the fact that very few patients will choose to undergo surgery without receiving anesthesia." —— *U.S.* at ——, 104 *S.Ct.* at 1575, 80 *L.Ed.*2d at 33.

On the other side of the balance, Justice O'Connor concluded that the tie-in conferred significant benefits upon the hospital and the patients such as standardization of procedures, efficient use of equipment, and increased quality control. *Id.* Noting that such arrangements are generally accepted in the health care industry, she observed that the record contained no evidence of patient dissatisfaction with anesthesiological services at the hospital.

 Under the New Jersey Antitrust Act, application of the rule-of-reason requires analysis of the competitive and anti-competitive effect of the challenged practice under all relevant circumstances. *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.*, 94 *N.J.* 400, 414 (1983). Such an analysis requires insight into the economics of the industry to determine whether a given restraint is unreasonable. *State v. Lawn King, Inc.*, 84 *N.J.* 179, 211 (1980). The record before us, which contains nothing more than a cryptic statement of the market share and some abstract testimony about alternative methods of providing anesthesiology, fails to provide any such insight.

Notwithstanding the previously mentioned deficiencies in the record in the *Hyde* case, that record was more complete than the one before us. In *Hyde*, for example, the plaintiff presented testimony to establish the hospital's share of the relevant geographic market. By contrast, the only evidence adduced to establish J.F.K.'s market area was an unexplained excerpt from a hospital planning document. This record is devoid of proof that patients were forced to purchase the service of defendant doctors as the result of the hospital's market power.

As in *Hyde,* —— *U.S.* at ——, 104 *S.Ct.* at 1567, 80 *L.Ed.*2d at 23, plaintiffs' case also fails the rule-of-reason test. Plaintiffs offered no evidence of the market area for anesthesiological services. Furthermore, "the record sheds little light on how the arrangement affected consumer demand for separate arrangements with a specific anesthesiologist." —— *U.S.* at ——, 104 *S.Ct.* at 1567, 80 *L.Ed.*2d at 23. Several doctors testified variously that patients requested specific anesthesiologists "rarely," "occasionally," or in "one or two percent of the cases." All the record establishes is that the choice of anesthesiologists at J.F.K. was limited to the doctors comprising Anesthesia Associates.

Allowing plaintiff doctors to practice at J.F.K. would increase the range of choice at the hospital, but the nature of the transaction and the hospital's right to exercise some control

over the grant of staff privileges would continue to restrain "the patient's freedom to select a specific anesthesiologist * * *." —— *U.S.* at ——, 104 *S.Ct.* at 1568, 80 *L.Ed.*2d at 24. Certainly, the alleged tie is not so manifestly anti-competitive and devoid of redeeming virtue that on this record we could find a violation of a *per se* rule of illegality. *Joseph H. Reinfeld, Inc. v. Schieffelin & Co., supra,* 94 *N.J.* at 416.

Furthermore, the trial court found that the tying arrangement relieves J.F.K. of an administrative burden. That finding is consistent with Justice O'Connor's statement in *Hyde* that the tie-in insures 24-hour-a-day coverage and permits more efficient hospital administration. —— *U.S.* at ——, 104 *S.Ct.* at 1575, 80 *L.Ed.*2d at 33.

In another context, the adoption in *Hyde* by the United States Supreme Court of a *per se* test might pose a dilemma for us. The New Jersey Antitrust Act mandates that it "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes * * *." *N.J.S.A.* 56:9–18. Previously, however, we have employed the rule-of-reason test in analyzing alleged ties. *Pomanowski v. Monmouth County Bd. of Realtors,* 89 *N.J.* 306, 315 (1982); *State v. Lawn King, Inc., supra,* 84 *N.J.* at 210–13. The rule-of-reason test is particularly appropriate when, as here, we are confronted with a novel and complex issue with which New Jersey courts have had little experience. *Id.* Because the proof fails to satisfy both tests, however, we need not determine whether we would eschew the *per se* test for a rule-of-reason analysis in another case.

Because we find no violation of the New Jersey Antitrust Act, we need not determine defendants' alternative argument that Community is exempt from the New Jersey Antitrust Act pursuant to the statutory exemption for "bona fide religious and charitable activities of any not for profit corporation, trust or organization established exclusively for religious or charita-

ble purposes * * *." *N.J.S.A.* 56:9–5 b(5); see *Borland v. Bayonne Hosp.*, 122 *N.J.Super.* 387 (Ch.Div.1973); *aff'd o.b.*, 136 *N.J.Super.* 60 (App.Div.1975), *aff'd o.b. in part*, 72 *N.J.* 152, 156 (1977) (holding that all but one of the defendant hospitals was exempt under the statute); *see also* Kissam, Webber, Bigus & Holzgraefe, "Antitrust and Hospital Privileges: Testing the Conventional Wisdom," 72 *Calif.L.Rev.* 595, 623 & n. 125 (1982).

The judgment of the Appellate Division is affirmed.

*For affirmance* —Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal* —None.