**ROCKLAND PHYSICIAN ASSOCIATES, P.C., Ehsanollah Benaresh, M.D., Caridad M. Dy, M.D., Moon Young Kim, M.D., Anthony C.K. Lau, M.D., Rizalina Turla, M.D., Sidney Veitch, M.D., Plaintiffs,**

v.

**Warren GRODIN, M.D., Individually, and as Director, Department of Anesthesiology, Nyack Hospital, Nyack Medical Associates, P.C., Warren Grodin, M.D., President, Darrell Goode, M.D., David Miller, M.D., Mitchell Cohn, M.D. and Stephen Cagliostro, M.D., Individually and as members of Nyack Medical Associates, P.C., and the Nyack Hospital, Defendants.**

No. 84 Civ. 8586.

United States District Court, S.D. New York.

March 19, 1985.

See also, D.C., 616 F.Supp. 958.

Danziger & Markoff, Mount Kisco, N.Y., for plaintiffs.

McDonough Marcus Cohn & Tretter, P.C., New York City, for Nyack Medical Associates, P.C. and individual defendants.

Garfinkel, Wild & Travis, P.C., Great Neck, N.Y., for defendant Nyack Hosp.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

Plaintiffs, Rockland Physician Associates, P.C. ("RPA"), and individual anesthesiologists associated with RPA, commenced this action seeking damages and injunctive relief claiming breach of contract by defendant Nyack Hospital (the "Hospital"),

and violation of the Sherman Act by both the Hospital and defendants Nyack Medical Associates, P.C. ("NMA"), and individual anesthesiologists affiliated with NMA.

Plaintiffs have moved, pursuant to Rule 65, Fed.R.Civ.P., for a preliminary injunction ordering that anesthesiology cases at the Hospital be assigned such that the seven RPA members provide $\frac{7}{12}$ of the "basic value units"[1] in anesthesiology and the five NMA members provide $\frac{5}{12}$ of the basic value units. All defendants oppose the motion.

### Background

RPA is a professional corporation engaged in the practice of anesthesiology. Individual plaintiffs are shareholders and employees of RPA. Certain of the individual plaintiffs have practiced anesthesiology at the Hospital throughout the last decade. In 1979, RPA and the Hospital signed a contract (the "RPA contract") under which RPA was to be the exclusive provider of anesthesiology services at the Hospital. It was originally contemplated that the RPA contract would run until May 1, 1985, and that it would remain exclusive for the entire period. On December 31, 1983, however, the Hospital notified RPA that because of RPA's failure to provide a suitable member anesthesiologist to serve as director of the Hospital's department of anesthesiology, the contract would be considered non-exclusive for the remainder of the contract period.

Since February 1, 1984, defendant Warren Grodin, M.D., who has no affiliation with RPA, has been Director of Anesthesiology at the Hospital. As director, Grodin has been responsible for the scheduling of anesthesia services and has assigned a specific anesthesiologist to each regularly scheduled procedure requiring anesthesia.

---

1. According to plaintiffs, a standard "Relative Value Guide" assigns each type of anesthesiology procedure a number of "basic value units." The number of units assigned depends on various factors, including the relative difficulty of the procedure. Professional fees charged are determined on the basis of the number of value units and the time spent on the procedure. Plaintiffs' submissions pay scant attention to the time plaintiffs now spend on anesthesiology services at the Hospital or the total fees they collect. Rather, the papers focus almost exclusively on the question of basic value units.

At present, Grodin himself provides anesthesiology services at the Hospital, as do plaintiffs and the four additional individual defendants who with Grodin constitute the defendant group NMA. The Hospital and NMA have signed a contract (the "NMA contract") under which NMA is to be the exclusive provider of anesthesiology services at the Hospital for a five-year period beginning May 1, 1985.

As the number of non-RPA anesthesiologists with privileges at the Hospital has grown, the plaintiffs as a group have provided less service at the Hospital. According to plaintiffs, as of December 1984, plaintiffs' services total roughly one-third the number of "basic value units" provided by RPA before the appearance of NMA and the individual defendants.

At some point following the arrival of NMA, plaintiffs apparently solicited and received a number of formal or informal statements from members of the active staff in support of a continued relationship with RPA.[2] At least some members of the staff expressed a desire that RPA receive all or a proportionate or "fair share" of the anesthesiology assignments for their cases. The hospital staff apparently has not, however, adopted a practice of referring or assigning each individual case to a specific anesthesiologist. There is no indication on record that any RPA member has received any such specific referrals during the period in question, or that such referrals have ever been common. The Hospital has asserted, however, that it has a long-standing policy of honoring such assignments where feasible.

At this time, all individual plaintiffs retain their clinical privileges at the Hospital, no formal steps have been taken to revoke or cancel those privileges; it appears from the by-laws that the current privileges will expire within several months unless renewed. The governing documents of the

medical staff, *i.e.*, the by-laws and the rules and regulations issued pursuant to them, give almost no attention to the status of "contractual practitioners" such as the individual plaintiffs. However, these few points are clear:

1) privileges are to be granted on the basis of training, experience and competence;

2) privileges ordinarily can only be revoked or reduced (even at time of renewal) by action of the Board of Trustees after conference with the Medical Executive Committee; and

3) where privileges are revoked or reduced, the practitioner affected has certain hearing rights.

Further, it is apparent that the by-laws (and rules and regulations) nowhere expressly determine either (1) whether an anesthesiologist with Hospital privileges is entitled to practice where a specific referral to that anesthesiologist for a particular case is made by an attending physician, or (2) whether an anesthesiologist may practice where such a referral is made but the referral is disapproved as inappropriate by the Director of Anesthesiology.

The 1979 RPA contract was an exclusive contract, providing that "[n]o one except a qualified member of [RPA] having individual Medical Staff privileges shall be given the responsibility of administering anesthesia at the Hospital."[3] The agreement was to last five years, with automatic five-year extensions absent written notice to the contrary within a specified period. The agreement also provided that the contract would become non-exclusive under certain circumstances and that the Hospital could then "permit qualified anesthesiologists to practice ... even if they were not members" of RPA, but that such non-exclusivity would not terminate "any individual staff privileges of any anesthesiologist." Under the

---

2. A purported summary of such statements (the "designations") appears as exhibit 15 to the affidavit of Sidney Veitch, M.D. submitted in support of plaintiffs' motion for a preliminary injunction.

3. The NMA contract appears as exhibit E to the affidavit of James Dawson submitted in opposition to the motion for a preliminary injunction. The RPA contract appears as exhibit A to the Dawson affidavit.

agreement, RPA was permitted to add anesthesiologists to the group, as long as the new members also were appointed to the Hospital's medical staff.

The 1983 NMA contract is quite similar. It provides that through April 30, 1985, NMA has the non-exclusive right to administer anesthesia at the Hospital and that beginning May 1, 1985, NMA "together with such staff anesthesiologists [i.e., RPA members] who become physician-employees of [NMA] shall have the exclusive right to administer anesthesia at the Hospital." The contract is to remain in effect until May 1, 1990, unless terminated by the Hospital earlier "for cause." There is no provision for automatic renewal of the contract. During its term, NMA members are not permitted to engage in private practice of medicine outside the Hospital without advance written permission.

With respect to fees and billing, the contract provides that NMA is responsible for billing and collecting its own charges. A fee schedule, however, was apparently attached to and incorporated in the NMA contract. The contract expressly provides that NMA will not change the schedule without the consent of the Hospital, but that consent shall not be unreasonably withheld "provided such fee schedule is consistent with the usual and customary fees for such services in the geographic area of the Hospital." There are no other express limitations on NMA's fees; no minimum or maximum rates. From the face of the contract, it appears that NMA could lower or raise its rates provided the "consistency" requirement were met.

The NMA contract obliges Warren Grodin to serve as Director of Anesthesiology, to be responsible for the overall administration of the department, and to schedule the daily use of the operating theaters, including assignment of specific anesthesiologists to specific cases.

Plaintiffs now request a preliminary injunction requiring that plaintiffs be assigned a proportionate share of the anesthesia cases, measured by "basic value units." According to plaintiffs, a propor-

tionate distribution would be one where RPA members are assigned $7/12$ of the basic value units and NMA $5/12$ of such units.

### Discussion

The complaint in this action alleges a number of causes of action for breach of contract and violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2). In essence, plaintiffs allege that Warren Grodin and the Hospital have conspired to exclude plaintiffs from serving at the Hospital by engaging in discriminatory and exclusionary practices, and that their acts violate the by-laws of the Hospital, a contractual relationship between the Hospital and plaintiffs founded on the by-laws, and the provisions of the Sherman Act concerning restraints of trade and price-fixing.

To prevail in their motion for a preliminary injunction, plaintiffs must show 1) irreparable harm and 2) either the likelihood of success on the merits or the presence of "sufficiently serious and substantial questions going to the merits as to make them fair grounds for litigation" and a balance of equities tipping decidedly in plaintiff's favor. *See Arthur Guinness & Sons, P.L.C. v. Sterling Pub. Co., Inc.,* 732 F.2d 1095, 1099 (2d Cir.1984); *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983); *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*). In this case, plaintiffs have failed to demonstrate either element. Accordingly, the injunction must be denied.

### A. *Irreparable Harm*

An injury is not irreparable if a monetary award can provide adequate compensation. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, supra.* In this case, plaintiffs argue that a monetary award would be inadequate for two reasons. First, plaintiffs are losing professional contacts with the staff at the Hospital. Second, as a result of the diminished work load, individual plaintiffs may need to seek employment elsewhere, and RPA may be effectively forced out of

existence. On the facts of this case, neither argument is sufficient.

### 1. *Professional Contacts*

■ Plaintiffs concede the legality, by itself, of an exclusive contract for anesthesiology services at the Hospital. Plaintiffs apparently also concede that, at least where the attending physician makes no assignment, the Director of Anesthesiology is entitled to assign cases to specific anesthesiologists.[4] Further, plaintiffs provide no evidence that under ordinary circumstances it is usual for attending physicians at the Hospital to make anesthesiology assignments or referrals.

On these facts, it is difficult to argue that professional contacts are critical, or that their temporary loss to a group with a long-standing relationship to the Hospital staff will cause irreparable harm. Since anesthesiology at the Hospital does not ordinarily operate on a referral basis, relief which reinstated plaintiffs as exclusive (or non-exclusive) contractors with the hospital would automatically result in service assignments and automatically revive professional contacts. The situation is thus distinct from one where once customer contact or a source of supply is lost, there may be no way for a seller of services or goods to "get a foot in the door" again. *Cf. Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (termination of exclusive Ford dealership that would preclude individual plaintiffs from continuing in their long-term business may result in irreparable injury). Also, plaintiffs have not shown that professional contacts with Hospital staff, if critical, could not be maintained in other ways, as through service at other hospitals where Hospital staff members have privileges.

### 2. *Existence of RPA*

■ Individual plaintiffs do not argue that defendants' conduct will deprive them of livelihoods or ability to support themselves, but rather that defendants' behavior threatens the existence of the professional corporation, and that effective destruction of the corporation would constitute irreparable injury. This argument fails for several reasons. First of all, it is undisputed that until fairly recently, RPA provided services not only to Nyack Hospital, but also to Tuxedo Memorial Hospital (under an exclusive contract). RPA apparently no longer provides services elsewhere, but no proof has been offered that RPA will not again become eligible to provide services at those hospitals at some point in the future, perhaps when existing exclusive contracts expire. The threat from the loss of the contract at Nyack Hospital is not that RPA will be precluded from continuing to offer what it has always offered, namely anesthesiology services in the general geographic area, but simply that although able to offer the same services, it will have lost its remaining significant customer.[5] Particularly where RPA has engaged in and competed for anesthesiology services elsewhere and there is no showing that Nyack Hospital as a customer is unique in any significant sense, it would be unfair to characterize its business as "anesthesiology services at Nyack Hospital"[6] simply because Nyack is the hospital which

---

**4.** Plaintiffs acknowledge that within the Department of Anesthesiology it is the responsibility of the Director to schedule anesthesia service. Plaintiffs concede that it was Caridad Dy, M.D., a member of RPA, who scheduled anesthesia service from 1980 until the arrival of Warren Grodin.

**5.** Plaintiffs prefer not to characterize the Hospital as RPA's customer. As discussed below, there may be some reason to characterize the patient or physician as the customer where an individual referral is made. There is little reason, however, to view RPA, an entity which has no "privileges" or status on the staff, as dealing with a customer other than the Hospital.

**6.** The fact that RPA members retain clinical privileges cannot influence the analysis here. Plaintiffs' primary argument is that RPA is being impermissibly excluded, not its members. Nothing would prevent individual RPA members from serving at the Hospital under the exclusive contract, were they to join NMA, which does not have a fixed or closed membership. Further, there is little room to dispute that individual plaintiffs can compete in a market larger than that of Nyack Hospital.

remains "available". Thus, it cannot be said that defendants' behavior will disable or destroy RPA or preclude it from continuing in a going business. *Cf. Jackson Dairy, Inc. v. H.P. Hood & Sons, supra* (fact that loss of significant customer might make an entire delivery route unprofitable and "force" its cancellation does not constitute irreparable injury); *Semmes Motor, Inc. v. Ford Motor Co., supra.*

### 3. *Direct Loss from Reduced Assignments*

■ To the extent that plaintiffs claim economic loss from defendants' wrongful refusal to honor staff designations of RPA as the group to provide all or part of the anesthesia at the Hospital, there is no question that a monetary award would represent an adequate remedy.

### B. *Likelihood of Success on the Merits*

Neither plaintiffs' contract claims nor their antitrust claims seem likely to succeed.

### 1. *Contract claims*

■ Plaintiffs argue that RPA is entitled to be regularly assigned to perform at least 7/12 of the anesthesiology basic value units at the Hospital. The logic of plaintiffs' argument is that 1) the members of RPA individually retain anesthesiology privileges at the Hospital; 2) the by-laws (and rules and regulations) of the Hospital place primary and continuing responsibility for a patient's care on the attending physician, so that 3) the Director of Anesthesiology and the Hospital must respect an attending physician's assignment of an anesthesiologist; and 4) the "designations" of RPA set forth in plaintiffs' exhibit constitute such assignments.

Although there is no dispute that the members of RPA retain clinical privileges, this argument is flawed. First of all, plaintiffs' interpretation of the by-laws is fragile. As noted earlier, the by-laws nowhere define the significance of a grant of anesthesiology privileges, or the relationship between an attending physician and the Hospital or Director of Anesthesiology. Indeed, the anesthesiology practitioners are clearly referred to only once, briefly, in the article on membership. "The ... contractual practitioners will be exempt from this geographical requirement." The vast majority of the by-laws concern the Active Staff, a category which does not include anesthesiologists, with the exception of the Director. The rules and regulations heavily relied on by plaintiffs relate primarily to the relationship between active staff (serving as admitting or attending physicians) and consulting physicians. That the term "consulting physicians" does not include anesthesiologists is clear. The by-laws distinguish consulting staff from contractual practitioners, specifically defining the requirements for consulting staff status in Article IV. Consulting staff have no treatment privileges. Thus, simply because of the subject matter of the by-laws and regulations, any construction which grants a specific right with reference to anesthesiology assignments is doubtful.

Second, even if one were to treat the regulations as directly concerned with the question of anesthesiology, the language of the by-laws and regulations is unhelpful. Though the regulations do state that the attending physician retains the ultimate responsibility for patient care, the context is one setting forth the respective roles of attending and consulting physicians, plainly to ensure that confusion and lapses in patient care do not arise. Elsewhere in the by-laws and regulations, responsibility for medical care is placed on the medical staff, the medical executive committee, departmental directors, and the Board of Trustees. The situation is one of overlap—the by-laws cannot and do not exonerate all parties other than the attending physician from responsibility for patient care.

Even assuming, however, that an attending physician unambiguously retains ultimate authority under the by-laws, problems arise. For example, an attending physician cannot designate any anesthesiologist; hospitals retain considerable rights to control who may practice in their facili-

ties. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984). Further, the language of the by-laws and regulations which requires that the attending physician retain responsibility unless he or she specifically delegates it in writing with both the specific patient's and delegate physician's consent, suggests that blanket designations of anesthesiology assignments to a group of anesthesiologists must be considered ineffective delegations. For in such "designations," attending physicians are not exercising judgment and choosing in writing a specific anesthesiologist for a specific patient. They are leaving it to someone else, presumably the Director of Anesthesiology,[7] to exercise judgment as to which anesthesiologist can and should serve on a specific case. The effect is to force the Director to assign cases, exercise judgment, and assume the risk that his judgment is faulty, yet to prohibit him from choosing from the entire pool which he had a right to expect to be available to him when he agreed to direct the department.[8]

Were there a mishap in a procedure where the attending physician had specifically requested a particular anesthesiologist, the Director of Anesthesiology and the Hospital might be relieved from liability (as long as there had been no negligence in the granting of privileges), on the ground that they had no control of the situation. That is not the case with the purported designations seen in this case ("100%" of my cases to RPA anesthesiologists, an "equal share" of my cases to RPA members).[9] The Director could remain liable on the theory that he retained control to select among the more and less

able members of RPA and among the more and less difficult cases.

Three additional problems with honoring the blanket designations should be noted. First, rights implied from the by-laws would run to individual practitioners with privileges, not to RPA as an entity. The by-laws make no mention of any group practice or group privileges. Individuals receive privileges. It is individual competence which is reevaluated annually. If no individual members of RPA can come forth and show that his or her personal "right" under the by-laws was violated because an assignment to him or her was dishonored, there would seem to be no violation. Second, neither NMA nor RPA has a fixed membership—both contracts provide that new members may be added and present members may withdraw. Where group membership may fluctuate, it is clear that in designating a group, a physician is not making a specific, final decision. Third, the purported summary designation before the court (as exhibit 15 to the affidavit of Sidney Veitch) is insufficient to persuade the court that the underlying designations were in fact made. Neither the affidavit nor the exhibit itself describes the source of the figures, the dates of the assignment, the manner in which the designations were received or solicited, discusses any of the obviously relevant circumstances, or otherwise establishes the document's accuracy or meaning.

The preceding discussion is not intended to suggest that plaintiffs' claims to be entitled to practice at the Hospital are wrong as a matter of law. Plaintiffs' argument

---

**7.** As noted above, plaintiffs concede that authority to assign cases rests with the Director of Anesthesiology, at least where there is no assignment from the admitting or attending physician. Under the by-laws and the contracts before the court, there is virtually no justification for an argument that the head of RPA, an entity which does not have privileges and has no recognizable status under the by-laws, has any authority to assign cases.

**8.** Although both RPA and NMA are subject to changes in membership, and the Director has no clear right to expect that any other member

will remain with a particular group and available for assignment, when Warren Grodin agreed to become Director he would have been justified in assuming that if he had doubts about the advisability of assigning another anesthesiologist to a case, he would be able to take the case himself. Under the plaintiffs' argument, this is not true.

**9.** See exhibit 15 to the affidavit of Sidney Veitch, M.D., submitted in support of the motion for a preliminary injunction.

that they are entitled to practice at the Hospital as long as they retain clinical privileges may well have merit, if they can show that specific assignments to individual anesthesiologists for particular cases are being ignored, or that assignments in general do not reflect good-faith judgment based on medically relevant criteria.* But since no such showing has been made, there is no basis upon which to grant the requested injunction.[10]

## C. *Antitrust Claims*

Plaintiffs claim that defendants' activities constitute both an illegal restraint of trade and an illegal price-fixing arrangement, in violation of 15 U.S.C. §§ 1 and 2. From the facts presently before the court, it seems unlikely that either claim will succeed.

### 1. *Price-Fixing*

As noted earlier, the contract between the Hospital and NMA contains language which suggests that a fee schedule for anesthesia services is incorporated into the contract. Although the court has not seen the fee schedule which apparently was at-tached originally as Appendix B to the contract, there is no dispute that NMA's members charge more for their services than do RPA members. But even assuming that a fee schedule listing prices higher than those charged by RPA was included in the NMA contract, plaintiffs' price-fixing claim is likely to fail.

First, there is no dispute that it is permissible for NMA members to agree among themselves to a uniform price schedule. This practice has been upheld in the courts. *See Konik v. Champlain Valley Physicians Hosp. Med. Center*, 733 F.2d 1007, 1012 n. 3 (2d Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). It also is and has been the conceded practice of plaintiffs themselves. Thus, what plaintiffs challenge is not the setting of uniform prices within NMA but the alleged conspiracy with the Hospital to fix uniform prices.

 From the facts before the court, it seems unlikely that the Hospital will be found to have conspired with NMA and its members to fix prices in a way which has injured plaintiffs. The evidence plaintiffs

---

* Given the criteria and procedures set forth in the by-laws for granting, cancelling, limiting or refusing to renew privileges and staff membership, and the procedural protections afforded under New York law, it is disingenuous of defendants to argue that failure to grant the Director of Anesthesiology absolute discretion over assignment of cases would deprive the Director and Hospital of an essential opportunity to exercise judgment. The granting of privileges must be conceived of as an exercise of judgment. Having granted privileges to plaintiffs, and having failed to take any steps to revoke or limit those privileges, the court must presume that the individual plaintiffs are competent and entitled to perform anesthesia procedures where specifically and individually requested by a patient or attending physician and no medically relevant reasons are set forth explaining why the request is inappropriate. *Cf.* Nyack Hospital By-laws, art. III, sec. 4; J.C.A.H. 1985 Accreditation Manual for Hospitals, "Anesthesia Services," Standard 2 (Interpretation). And certainly the court must presume at this stage that the individual plaintiffs are competent to perform simpler anesthesia procedures. If for some reason the judgment of the Director is otherwise, the procedures set forth in the by-laws concerning limitation or revocation of privileges should apply. The fact that those procedures sharply limit the Director's or the Hospital's ability to unilaterally revoke clinical privileges is not a justification for attempting to achieve the same result through other means.

10. The court will defer consideration of defendants' contention that plaintiffs have failed to establish a sufficient nexus between the challenged NMA contract and interstate commerce until the factual record is more fully developed. The court also finds it premature to rule whether plaintiffs must present certain of their claims to the Public Health Council of the New York State Department of Public Health pursuant to N.Y.Pub.Health L. § 2801–b. Clearly, there is no requirement that RPA, an entity which has no "privileges" as such, present its claims to the Council. If further evidence suggests that individual plaintiffs' privileges have been violated, such claims may need to be presented to the Council. On the present record, however, plaintiffs' primary evidence is that designations of RPA are being dishonored. While plaintiffs may wish to characterize dishonor of the RPA designations as a violation of their privileges or rights implied under the by-laws, the court is inclined to treat the dishonor as potentially injuring RPA, not individual plaintiffs.

present with respect to price fixing is the NMA contract itself; the language of the contract is unpersuasive. At most, the contract adopts on a temporary basis any fees set forth in "Appendix B." No minimum or maximum fees are set. Under the contract, NMA does its own billing and collects its own charges. Since the Hospital cannot unreasonably withhold consent to changes in the fee schedule where the proposed fees are "consistent with the usual and customary fees for such services in the geographic area of the Hospital," NMA essentially seems free to increase or reduce its prices as long as they retain some connection to competitive prices in the area. A restriction so minimal, particularly if one takes into account the lack of specificity inherent in the the terms "consistent" and "geographic area," is unlikely to have injured plaintiff. Similar restrictions in contracts presumed to be exclusive have withstood challenge under the Sherman Act. *See Konik v. Champlain Valley Physicians Hosp. Med. Center*, 733 F.2d at 1019 (contract which limited professional corporation's anesthesiology fees to levels "no greater than those charged by other anesthesiologists for similar work situations in upstate New York" could not be attacked by non-member anesthesiologist where injury to non-member could not be proven). Here, where plaintiffs are lower-priced competitors, not buyers of anesthesiology services, it is particularly unclear how plaintiffs propose to establish either their antitrust standing or antitrust injury. *Cf. Triple M. Roofing Corp. v. Tremco*, 753 F.2d 242 (2d Cir.1985) (standing inquiry encompasses indirectness of asserted injury and speculative nature of damage theory); *Konik v. Champlain Valley Physicians Hosp. Med. Center, supra.*

### 2. *Restraint of Trade*

Plaintiffs' second antitrust claim is that the NMA exclusive dealing contract constitutes an illegal restraint of trade because, as of May 1, 1985, it will eliminate RPA and its members as a competitor in the relevant market. This claim also seems unlikely to succeed at trial.

In this case, the court need not and does not decide whether exclusive dealing contracts for anesthesiology are, as a general matter, impermissible. Both plaintiffs and defendants have benefitted from such contracts; plaintiffs concede that exclusive dealing contracts for anesthesiology services at Nyack Hospital are in theory permissible. In part because of plaintiffs' concession, the court considers it most likely to be appropriate to analyze plaintiffs' claim under a rule of reason. If exclusive contracts for anesthesiology in theory are permissible, it would be peculiar to set apart one such specific contract on the basis of particular factual circumstances and deem it *per se* illegal. This is because *per se* analysis is most appropriate where a category of economic restraints or arrangements can be judged to rarely serve any purpose other than restraint of competition, and is useful precisely to avoid the time and expense of analyzing the particular circumstances and market conditions in individual cases. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 1560 n. 3, 80 L.Ed.2d 2 (majority opinion), 1569 (O'Connor, J. concurring) (1984). Further, courts typically refuse to apply *per se* rules to exclusive dealing contracts concerning professional services. *See, e.g., Konik v. Champlain Valley Physician's Hosp. Med. Center, supra; Dos Santos v. Columbus-Cuneo-Cabrini Med. Center*, 684 F.2d 1346, 1352 (7th Cir.1982); *Belmar v. Cipolla*, 96 N.J. 199, 475 A.2d 533 (1984).

Under a rule of reason approach, plaintiffs must show more than that NMA competed with the intent to obtain a contract and prevent another group of anesthesiologists from rendering services at the Hospital. What must be shown is that defendants' actions were anticompetitive by design and "culminated in a contract that ... is of such scope that its restraints may be considered unreasonable." *Konik v. Champlain Valley Physicians Hosp. Med. Center, et al., supra*, 733 F.2d at

1014–15;[11] *see also Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 954–56 (6th Cir.1983). Further, the restraints must be shown to be unreasonable in "a market that affects an 'appreciable part' of interstate commerce." *Triple M Roofing Corp. v. Tremis, Inc., supra.*

Given plaintiffs' concession that exclusive contracts such as the initial RPA contract are permissible, their argument that the NMA contract cannot stand is necessarily grounded on the contentions that 1) defendants' intent and purpose in establishing the NMA contract was impermissible and that 2) Nyack Hospital constitutes the relevant market. On the record presently before the court, it appears that any questions of defendants' intent must be reserved for trial. *See, e.g., Smith v. Northern Michigan Hospitals, supra.* It is still possible for the court to judge that the claim is unlikely to succeed, however, because of the analysis of the relevant market.[12]

Plaintiffs urge the court to consider the relevant market to include Nyack Hospital alone. On the present record, such a finding is not justified.

■ In defining the relevant market, the court must consider the area within which anesthesiologists or anesthesiology practice groups compete with one another to provide services or obtain contracts. *See Jefferson Parish Hosp. Dist. N. 2 v. Hyde, supra,* 104 S.Ct. at 1567 (competition among anesthesiologists for exclusive contracts to be considered). A single hospital may constitute the relevant market from the point of view of patients, yet not constitute the market for the purpose of analyzing the claims of providers of services. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, supra,* 104 S.Ct. at 1567. Several cases suggest that it would rarely be appropriate to define a single hospital as the relevant market for providers of services. *See, e.g., Dos Santos v. Columbus-Cuneo-Cabrini Med. Center, supra,* 684 F.2d at 1353; *Harron v. United Hospital Ctr., Inc.,* 522 F.2d 1133 (4th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976); *cf. Konik v. Champlain Valley Physicians Hosp. Med. Center, supra* (single hospital might be relevant market for analysis of tying claim where hospital is only major facility in a three-county area).

With respect to the claims of individual plaintiffs, it seems clear that the market is likely to extend beyond Nyack Hospital. No showing has been made that plaintiffs cannot reasonably be expected to compete as individuals elsewhere, whether by seeking to join other professional corporations holding exclusive contracts or by seeking

**11.** Much of the analysis in the *Konik* case does not apply here, where the issue is whether a given exclusive contract is reasonable. In *Konik,* the key issue was whether the contract was exclusive. Here, it is conceded both that the contract is exclusive and that exclusive contracts may be permissible. Some dicta in *Konik,* however, addresses the situation that would arise were the contract exclusive. In particular, the discussion suggests that factors to be considered include, 1) "the right of hospitals to exert some control over the identity and number of staff members with privileges," 2) the length of the exclusive contract, 3) the possibilities for review or termination of the contract, 4) whether the contract includes any provisions perpetuating the arrangement at the option of either party, and 5) whether the Hospital is "entirely free to contract with [another] provider" at the end of the exclusive contract. While the opinion does note that the plaintiff was offered opportunities to continue practice before being excluded, there is no indication that this is to be given special weight. Rather, it seems to be one consideration in determining whether and to what extent an arrangement excludes "other" anesthesiologists.

**12.** Plaintiffs' argument that the NMA contract significantly differs from the RPA contract because it was intended to exclude existing competitors at the Hospital is unpersuasive. First, as suggested in *Konik* (see footnote 8), it is unclear that identified competitors have any greater status for antitrust analysis than unidentified competitors. Second, it is doubtful that RPA's contract should be characterized as the product of historical process or "historic accident". *See Konik,* 733 F.2d at 1018. Any monopoly power the RPA group members had prior to the 1979 contract may have been acquired inadvertently, but the court is inclined to characterize the acquisition in 1979 of the exclusive contract as a deliberate act to maintain any such power.

privileges at hospitals which operate on a referral or non-exclusive basis. *Cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, supra,* 104 S.Ct. at 1556 n. 8 (notes absence of showing of nature of anesthesiology practices at other hospitals in New Orleans metropolitan area), 1567 (competition may be statewide or merely local). Plaintiffs' main contention, then, is that Nyack Hospital constitutes the relevant market for RPA as an entity.

Plaintiffs rely on the fact that Nyack Hospital is the only hospital at which RPA presently operates to establish the Hospital as the relevant market. But such a definition lends too much weight to plaintiffs' deliberate choices and too little to the underlying economic concerns. Under plaintiffs' view, any time a group voluntarily chooses to contract to practice exclusively at a particular hospital, that hospital alone will become the relevant market (because the group would compete and operate only at that facility), and it will be impossible to oust the group with a successor group without violating the antitrust laws. This would be true regardless of the number of hospitals in the area, the opportunities which exist for the group or its individual members to seek contracts or privileges elsewhere, and the general competitive nature of the profession as a whole. Such a view is too narrow to serve the purposes of the antitrust laws, and indeed would seem to work against competition by permitting groups to establish what is essentially a permanent entitlement to serve at particular facilities, regardless of other competitive forces.

If one's analysis goes beyond the fact that the Hospital is RPA's current operational base, it seems quite clear that the relevant market will include other hospitals as well. First, other hospitals operate in the same general area, a large number of them if one considers Nyack as part of the New York metropolitan area. That many local hospitals may currently operate under exclusive contracts with groups other than RPA does not persuade the court that they should be deemed removed from the competitive market in which RPA so participates, so that Nyack Hospital by default becomes the only "available" setting for practice.[13] Because plaintiffs have presented little or no evidence concerning anesthesiology at other local hospitals, the court is unaware of such a factor as the durations of the exclusive contracts which exist. Absent a factual showing, the court assumes that the exclusive contracts do not foreclose competition and that RPA is free to compete with other groups for the award of such contracts. Second, as noted earlier, RPA in fact has competed and provided services at local hospitals other than Nyack Hospital. For most of the past decade RPA provided services under exclusive contract not only at Nyack Hospital, but also at Tuxedo Memorial Hospital. That RPA's contract with Nyack Hospital did not restrict the group's practice to the Hospital and that "outside practice" did take place strongly suggests that RPA in the past has considered the relevant market to encompass more than the Hospital alone. Third, there is some evidence on record which suggests that the Hospital solicits anesthesiology groups from an area which extends at least to the New York metropolitan area. The area from which the Hospital (not NMA) seeks applicants for its exclusive contracts helps to define the relevant market in cases where, as here, there is little or no evidence that patients or surgeons ordinarily specify an individual

---

**13.** Plaintiffs' apparent view that exclusive contracts so effectively remove the hospitals offering them from the market that they need not be considered in defining the relevant market goes too far. Competition and market concepts may encompass competition for exclusive contracts. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, supra,* 104 S.Ct. at 1567. Competition for exclusive contracts may be relevant not only in defining the market in which groups such as RPA compete but also in defining the market for individual anesthesiologists. *See Jefferson Parish, supra,* 104 S.Ct. at 1567 n. 48. Award of an exclusive contract, particularly to a group with a fixed or closed membership, does temporarily remove a hospital from the competitive market, *see Jefferson Parish, supra,* 104 S.Ct. at 1568 n. 51, but this does not mean that the hospital involved is to be ignored or treated as absent from the "affected market."

anesthesiologist, so that the Hospital will be treated as the "buyer" of services. *See, e.g., Dos Santos v. Colombus-Cuneo-Cabrini Med. Center, supra,* 684 F.2d at 1354; *cf. Konik v. Champlain Valley Physicians Hosp. Med. Center,* 561 F.Supp. 700, 715 (N.D.N.Y.1983), *aff'd,* 733 F.2d 1007 (2d Cir.1984).

██ Regardless of the precise definition of the relevant market, plaintiffs' showing is weak that defendants' conduct is unreasonable. Defendants have provided a number of general justifications for the use of exclusive dealing contracts for hospital anesthesiology services. Many of the justifications are noted (with approval) in recent court cases, including the concurring opinion in *Jefferson Parish* and the opinion in *Belmar v. Cipolla, supra,* 96 N.J. at 203–04, 209–12, 475 A.2d 533.[14] Further, given plaintiffs' prior exclusive contract with the Hospital and plaintiffs' concession that exclusive contracts in theory are permissible, the specific provisions of the NMA contract seem reasonable. The NMA contract is for five years, as was the RPA contract. Where the RPA contract contained automatic renewal provisions, the NMA contract does not. Also, unlike the RPA contract, the NMA contract prohibits NMA from practicing elsewhere during the contract period without prior approval by the Hospital, effectively reducing the possibility that NMA could monopolize the market for anesthesiology services in local hospitals.

Thus, it seems most likely that in this case, the exclusive dealing contract will be upheld under the rule of reason.

## D. *Balance of Hardships*

██ Although on the basis of the preceding discussion it also appears that plaintiffs fail to raise "sufficiently serious and substantial questions going to the merits as to

make them fair grounds for litigation," *Arthur Guinness & Sons, P.L.C. v. Sterling Pub. Co., Inc., supra,* the court need not decide the issue, as plaintiffs have failed to establish that the balance of hardships tips decidedly in their favor.

The court recognizes that the present situation at Nyack Hospital may impose economic hardship on the individual plaintiffs and oblige them to relocate or seek employment elsewhere if they wish to continue to support themselves as practicing anesthesiologists. Granting the injunction plaintiffs request would allocate some of the economic loss to individual defendants for the duration of the litigation and perhaps prevent plaintiffs from feeling forced to change positions immediately. Were this the only effect, the court might view the relative hardships as justifying an injunction. However, granting the injunction would impose other more dramatic hardships on defendants, potentially interfering with defendants' obligations to their patients and the public.

To force the Hospital and the Director of Anesthesiology to recognize the designations of RPA to the extent of "fair share" scheduling would put the Hospital and director in the difficult position discussed earlier of retaining responsibility (and potential liability to third parties) for assignment of anesthesiologists yet being unable to exercise full judgment to allocate work among staff members with privileges on the basis of competence, experience and other medically relevant factors. To remove a substantial amount of the director's discretion, yet require that the Hospital and director retain responsibility and liability for the proper provision of anesthesiology services would constitute a substantial hardship indeed. In the absence of any showing that individual plaintiffs will be

---

**14.** Plaintiffs' argument that the fundamental logic of *Belmar* is inapplicable because the Hospital here operates on a referral basis is unpersuasive. Regardless of the theoretical ability of an attending physician to designate a specific individual to serve as anesthesiologist on a particular case, it seems clear from the present

record that Nyack Hospital in fact has not operated on a "referral" basis in many years. Plaintiffs' own papers concede that during the period the RPA contract was exclusive, it was Dr. Dy who made the anesthesiology assignments and controlled the scheduling.

unable to support themselves as practicing anesthesiologists elsewhere, or that any significant number of patients or attending physicians are being denied the opportunity to designate a specific individual with anesthesiology privileges to assist with a particular procedure, it simply cannot be said that the plaintiffs face the more serious hardships.

### Conclusion

Accordingly, plaintiffs' motion for a preliminary injunction is denied.

So Ordered.